EXHIBIT C

AMENDED AND RESTATED
SERVICE AGREEMENT

AMONG

STATE OF CONNECTICUT, BY THE

CONNECTICUT DEPARTMENT OF TRANSPORTATION,

METROPOLITAN TRANSPORTATION AUTHORITY

AND

METRO-NORTH COMMUTER RAILROAD COMPANY

Dated as of June 21, 1985

TABLE OF CONTENTS

Page

PARTIES    ........................................    1

RECITALS   ........................................    1


ARTICLE ONE

DEFINITIONS


Section 1.01.   Definitions ..........................    4


ARTICLE TWO

THE SERVICE AND ITS OPERATION


Section 2.01.   The Service .........................    10

Section 2.02.   Operation of the Service .............    11

Section 2.03.   Service Fares .......................    12

Section 2.04.   Modification of the Service ..........    12

Section 2.05.   Service Meetings......................    13

Section 2.06.   Provision of Information to
                CDOT and MTA.........................    14


ARTICLE THREE

ALLOCATION AND PAYMENT OF OPERATING DEFICITS


Section 3.01.   Main Line ............................    16

Section 3.02.   Branch Lines ........................    16

Section 3.03.   Grand Central Terminal ...............    16

-i-

Page

Section 3.04.   Adjustment of Prior Payments ..........   16

Section 3.05.   General Provisions as to Payments .....   17

ARTICLE FOUR

CLASSIFICATION AND ACQUISITION
OF CAPITAL ASSETS

Section 4.01.   Classification of Capital Assets.......   20

Section 4.02.   Future Acquisition of Nonmoveable
                Capital Assets.......................   20

Section 4.03.   Future Acquisition of Moveable
                Capital Assets.......................   21

Section 4.04.   Capital Projects.....................   22

ARTICLE FIVE

ALLOCATION AND PAYMENT OF CAPITAL COSTS

Section 5.01.   Nonmoveable Capital Assets ...........   23

Section 5.02.   Moveable Capital Assets ..............   23

Section 5.03.   CDOT Payment of Capital Costs ........   25

Section 5.04.   General Provisions as to Payments .....   25

Section 5.05.   Adjustment of Prior Payments..........   25

ARTICLE SIX

SERVICE FINANCES AND BUDGET PROCESS

Section 6.01.   Accounts .............................   26

Section 6.02.   Service Revenues .....................   28

Section 6.03.   Service Costs ........................   28

Section 6.04.   Annual Budget Process .................   28

Section 6.05.   Quarterly Financial Review Meetings....   30

Section 6.06.   Capital Budget Process ................   30

Section 6.07.   Prior Operating and Capital Expenses...   31

Section 6.08.   Five-Year Capital Plan ................   31

### ARTICLE SEVEN

### ASSET OWNERSHIP AND MANAGEMENT

Section 7.01.   Title to Assets.......................   32

Section 7.02.   Asset Management Review...............   33

### ARTICLE EIGHT

### LABOR

Section 8.01.   Labor Negotiations....................   34

### ARTICLE NINE

### PRODUCTIVITY REVIEW

Section 9.01.   Productivity Review...................   35

Section 9.02.   Resolution of Disputes Relating
                to the Productivity Review..........   36

### ARTICLE TEN

### ARBITRATION

Section 10.01.  Settlement of Disputes...............   37

Page

Section 10.02.    Arbitration Procedure.................    37

Section 10.03.    Financial Arbitration Procedure.......    39

Section 10.04.    Arbitration Awards....................    41

Section 10.05.    Certain Matters Not Subject To
                  Arbitration.........................    42

Section 10.06.    Enforcement of Awards.................    42

## ARTICLE ELEVEN

### CLAIMS

Section 11.01. Claims Prior to January 1, 1983.......    42

Section 11.02. Claims After January 1, 1983..........    43

Section 11.03. Certain Claims Arising Out
               of Incidents Involving the
               Service and Other Railroad
               Transportation Operated by
               Metro-North.........................    43

Section 11.04. Selection of Counsel for the
               Litigation of Claims.................    44

## ARTICLE TWELVE

### DURATION OF THE AGREEMENT

Section 12.01. Effective Date........................    45

Section 12.02. Term..................................    45

Section 12.03. Renewal...............................    45

Section 12.04. Termination Rights....................    46

Section 12.05. Procedures Upon Termination...........    46

ARTICLE THIRTEEN

MISCELLANEOUS

Section 13.01. Notices.................................   50

Section 13.02. Office Space...........................   51

Section 13.03. Governmental and Court Approval........   51

Section 13.04. Force Majeure .........................   51

Section 13.05. Successors and Assigns ................   51

Section 13.06. Past Agreements........................   52

Section 13.07. Future Agreements......................   53

Section 13.08. Connecticut Express Waiver of
               Sovereign Immunity.....................   53

Section 13.09. Connecticut Non-Discrimination Statute
               and Executive Orders...................   54

Section 13.10. Interpretation.........................   56

APPENDICES

APPENDIX A.    Uniform Accounting Principles for
               Service

APPENDIX B.    Identification of Map of Grand
               Central Terminal

APPENDIX C.    Service Schedule

APPENDIX D.    Service Consists

APPENDIX E.    Service Fares

APPENDIX F.    Identification of Branch Line Maps

AMENDED AND RESTATED SERVICE AGREEMENT

Agreement dated as of June 21, 1985 among the State of Connecticut, acting through its duly authorized agency, the Connecticut Department of Transportation ("CDOT") by the Commissioner of Transportation pursuant to Conn. Gen. Stat. § 13b-34(a), Metropolitan Transportation Authority, a public benefit corporation of the State of New York ("MTA") and Metro-North Commuter Railroad Company, a public benefit corporation of the State of New York ("Metro-North").

WHEREAS, the MTA Purchase Agreement, CTA Lease Agreement, GCT Joint Facilities Agreement and Service Contract among MTA, the Penn Central Transportation Company ("PC") and the State of Connecticut, acting through its duly authorized agency, the Connecticut Transportation Authority of the Department of Transportation ("CTA"), executed concurrently on October 27, 1970 (in each case as amended to the date hereof, and being collectively referred to as the "Service Agreement"), provided for the provision of commuter services by PC to MTA and CTA on the West End suburban pas-

-1-

senger train route of the former New York, New Haven and
Hartford Railroad Company;

WHEREAS, pursuant to the Regional Rail Reor-
ganization Act of 1973, on April 1, 1976, the Consolidated
Rail Corporation ("Conrail") assumed certain obligations,
including but not limited to, the operation of the Service
under the Service Agreement;

WHEREAS, following the enactment of the Northeast
Rail Service Act of 1981, 45 U.S.C. Sec. 774(a) ("NERSA"),
Conrail ceased to operate commuter services under the Service
Agreement as of December 31, 1982, and the parties hereto
entered into an amendment to the Service Agreement dated as
of December 31, 1982 (the "Interim Service Agreement")
providing for the continuation of the service (as defined
therein) pursuant to the terms thereof; and

WHEREAS, the Interim Service Agreement provided for
determination by an arbitration panel of the fair and equi-
table allocation between MTA and CDOT of the net Service
operating deficit and Service capital cost, which deter-
mination was made by an Arbitration Award released on Septem-
ber 7, 1984 (the "Award"), together with a simultaneous
exchange of agreements between MTA and CDOT on non-economic
issues; and

-2-

WHEREAS, the parties have agreed to certain modifications of the Service Agreement in addition to those necessitated by the Award; and

WHEREAS, the parties have, from time to time, entered into other agreements of relevance to operation of the Service; and

WHEREAS, for ease of administration the parties wish, to the fullest extent possible, to set forth the unchanged portions of all prior agreements, including the Service Agreement, together with the newly agreed upon amendments in one instrument (the "Amended and Restated Service Agreement" or the "Agreement");

WHEREAS, the parties intend this Amended and Restated Service Agreement to supersede all past agreements except as otherwise provided herein; and

WHEREAS, the State of Connecticut, acting though its duly authorized agency, CDOT, by the Commissioner of Transportation has made the express finding pursuant to Conn. Gen. Stat. § 13b-35 that certain specified transportation facilities with respect to which the powers conferred by Conn. Gen. Stat. § 13b-34(a) are to be exercised, namely the Service (as herein defined), may be discontinued, disrupted

-3-

or abandoned in whole or in part; the discontinuance, disruption or abandonment of such Service will be detrimental to the general welfare of the State of Connecticut, and the exercise of such powers are essential to the continuation of such necessary transportation facilities; and

WHEREAS, pursuant to said Conn. Gen. Stat. § 13b-34, the Commissioner of Transportation is authorized to contract in the name of the State of Connecticut with any person for purposes of initiating, continuing, developing, providing or improving such transportation service.

NOW THEREFORE, in consideration of the mutual promises herein contained and in order to provide for the implementation of the Award and the agreements on non-economic issues and for certain other matters relating to the operation of the Service (as herein defined), the parties hereto agree to amend and restate the Service Agreement as follows:

ARTICLE ONE

DEFINITIONS

SECTION 1.01.  Definitions.  The following terms, as used herein, have the following meanings:

"Accounts" is defined in Section 6.01.

"Administrative Assets" means those Capital Assets

-4-

owned or to be acquired which are used to perform administrative functions with respect to the Service, including but not limited to computers, train control systems, power-control systems, automatic ticket selling and fare collection systems and equipment, training and other facilities, buildings, improvements and equipment or any portion thereof.

"Allocations" means MTA's and CDOT's respective shares of the operating deficits and Capital Costs of the Service as set forth in Articles Three and Five hereof.

"Approved Budget" for any year means the capital and operating budgets presented by Metro-North on or about October 1 of the preceding year as approved pursuant to the procedures set forth in Section 6.04 below.

"Award" has the meaning set forth in the recitals hereto.

"Branch Lines" means (a) the New Canaan Branch, (b) the Waterbury Branch, and (c) the Danbury Branch as described generally herein and more specifically set forth on the maps referred to in Appendix F.

"Branch Line Service" means those portions of the Service, as it shall be constituted from time to time, which serve passengers who use stations along the New Canaan, Waterbury and Danbury Branch Lines.

"Branch Lines Net Operating Deficit", calculated

according to the method set forth in Appendix A, includes all
costs of and revenues derived from providing Branch Line
Service.

"Capital Assets" means those assets used or to be
used in whole or in part for the Service which:  (1) are
deemed to be capital assets in accordance with generally
accepted accounting principles including, where applicable,
generally accepted railroad accounting principles, (2) have
an estimated useful life of more than three years from the
date of acquisition, and (3) have or had an acquisition cost
per unit of over five thousand dollars ($5,000).

"Capital Costs" means the costs, direct and
indirect, of a Capital Asset, including but not limited to
the purchase price, labor and materials costs, other
acquisition costs in accordance with generally accepted
accounting principles, and the estimated costs of contract
administration including associated overhead expenses, but
not including depreciation.

"CDOT" means the person named as "CDOT" in the
first paragraph of this Agreement.

"Danbury Branch" means that portion of the Service
extending from its junction with the Main Line in the City of
Norwalk, County of Fairfield and State of Connecticut and
thence running in a general northerly direction through the

City of Norwalk, the Towns of Wilton, Ridgefield, Redding, Bethel and the Town and City of Danbury, all in the County of Fairfield and State of Connecticut, to the Danbury passenger station along with a portion of the Maybrook freight line extending from said station to the southerly line of White Street.

"Effective Date" means the date set forth in Section 12.01.

"Emergency" means a Temporary situation or circumstance which is unforeseen and not planned for in the Approved Budget.

"GCT Joint Facilities Agreement" has the meaning set forth in the recitals hereto.

"Grand Central Terminal" means that portion of the terminal building of the New Haven Line located on 42nd Street in New York City identified in the map or maps referred to in Appendix B hereto.

"Grand Central Terminal Net Operating Deficit", calculated according to the method set forth in Appendix A, means the Service's share of the net operating deficit of Grand Central Terminal.

"Harlem Line Segment" means, for the purposes of this Agreement only, that portion of the Main Line which begins at milepost 0.0 at Grand Central Terminal and ends

-7-

at milepost 11.8 at Woodlawn over which the Service operates.

"Interim Service Agreement" has the meaning set forth in the recitals hereto.

"Main Line" means the New Haven Line and the allocated portions of the Harlem Line Segment which are between milepost 0.0 of the Harlem Line and 72.8 of the New Haven Line over which the Service operates, provided, however that the Main Line excludes the Branch Line Service and Grand Central Terminal.

"Main Line Net Operating Deficit", calculated according to the method set forth in Appendix A, means the net operating deficit of the Service excluding the Grand Central Terminal Net Operating Deficit and the Branch Lines Net Operating Deficit.

"Metro-North" means the person named as "Metro-North" in the first paragraph of this Agreement.

"Moveable Capital Assets" means (1) all Capital Assets which are not Nonmoveable Capital Assets and (2) all Administrative Assets.

"MTA" means the person named as "MTA" in the first paragraph of this Agreement.

"New Canaan Branch" means that portion of the Service extending from its junction with the Main Line in the Town of Stamford, County of Fairfield and State of Connec-

ticut and thence running in a general northerly direction
through the Towns of Stamford, Darien, and New Canaan in the
County of Fairfield and the State of Connecticut to the end
of said New Canaan Branch in New Canaan.

"New Haven Line" means that portion of the Main
Line which begins at milepost 11.8 at Woodlawn and ends at
milepost 72.8 in New Haven, Connecticut over which the Serv-
ice operates, and as further shown on the valuation maps
referred to in Appendix F and being the same property over
which the service has operated since January 1, 1971.

"Nonmoveable Capital Assets" means all Capital
Assets excluding Administrative Assets which will not be
relocated from their original site during their estimated
useful life, including, but not limited to, land, stations
and other buildings, real property additions, bridges,
towers, track, road bed, fixed signals, third rail, catanary
systems, substations and power generating plants.

"Prime Rate" means the rate of interest announced
by The Connecticut Bank and Trust Company, N.A. or its suc-
cessor from time to time as its prime rate.

"Service," "Service Consists" and "Service
Schedule" are defined in Section 2.01.

"Service Contract" is defined in the recitals
hereto.

"Service Costs" are defined in Section 6.03.

"Service Fares" are the fares charged and collected for passage on trains operated for the Service pursuant to Section 2.03.

"Service Revenues" are defined in Section 6.02.

"Temporary" means the limited period of time during which Metro-North is required to take certain acts to ensure the safe and reasonable operation of the Service where such acts are necessitated by operational, legal or safety considerations.

"Waterbury Branch" means that portion of the service extending from its junction with the Main Line in the Town of Milford and thence running in a general northerly direction through the Towns of Milford, Orange, Derby, Ansonia, Seymour, Beacon Falls and Naugatuck and the City of Waterbury, all in New Haven County and State of Connecticut, to the southerly line of Freight Street in the City of Waterbury.

ARTICLE TWO

THE SERVICE AND ITS OPERATION

SECTION 2.01.  The Service.  The Service shall consist of all activities and functions including maintenance and operations associated with the trains scheduled in the Service Schedule set forth in Appendix C, each such train

-10-

being made up according to the Service Consists set forth in Appendix D, as such train schedules and consists may be modified from time to time as provided in Section 2.04 below, together with any other transportation offered on a Temporary basis as a substitute.

SECTION 2.02.  Operation of the Service.  Metro-North shall have responsibility for the day-to-day operation of the Service, as it shall be constituted from time to time pursuant to the terms of this Agreement and shall provide the necessary crews, work force and supervisory personnel, none of whom shall be deemed to be employees of CDOT.  The Service shall be operated with the objective of providing timely, efficient, clean and courteous service to the public on a continuing basis.  Metro-North has the right to incur and charge to the Accounts all capital and operating expenses necessary to carry out its responsibility for the day-to-day operation of the Service, and to incur and charge such expenses at such times as it deems appropriate consistent with the Approved Budget.  Metro-North, MTA and CDOT agree to acquire and maintain the Capital Assets which are necessary to continue the Service on the Main Line at the level of service which is agreed upon by the parties from time to time pursuant to this Agreement.  For the duration of this Agreement all trains operated for the Service shall have access to the

-11-

Main Line, the New Canaan, Waterbury and Danbury Branch Lines
and Grand Central Terminal.

SECTION 2.03. <u>Service Fares</u>. Metro-North shall
charge and collect for the use of the Service the Service
Fares set forth in Appendix E as amended from time to time
as provided in Section 2.04 below.

SECTION 2.04. <u>Modification of the Service</u>.

(a) Metro-North shall have the right to amend the
Service Schedule, the Service Consists, or both, with respect
to the Service operated for the Main Line, subject to the
prior consent of MTA and CDOT. In addition to the foregoing,
Metro-North shall have the unilateral right to make Temporary
changes in the Service Schedule or Service Consists or both
with respect to the Service operated for the Main Line.

(b) MTA and CDOT shall each have the right to
propose amendments to the Service Fares for the Main Line.
Any such proposed amendment shall be implemented by Metro-
North provided the proposed amendment is approved by both MTA
and CDOT.

(c) CDOT shall have the right to amend the Service
Schedule, the Service Consists, the Service Fares, or any
one of them with respect to the Branch Line Service provided
however that Service Fares for Branch Line Service to or from
stations on the Branch Lines to or from stations on the Main

Line or Grand Central Terminal may not be less than the fares to or from the connecting stations on the Main Line (Stamford, Norwalk or Bridgeport) to or from Grand Central Terminal or other stations on the Main Line.  CDOT shall notify MTA and Metro-North of any proposed amendment to the Branch Line Service at least 60 days prior to the date on which notice of such amendment is anticipated to be made public, or longer if required by union contracts.

Notwithstanding the foregoing, Metro-North shall have the right to make Temporary changes in the Service Schedule or Service Consists or both with respect to the Branch Line Service and shall have the right to adjust schedules for the Branch Line Service by up to five minutes to allow synchronization of Branch Line schedules with Main Line schedules.  Metro-North shall also have the right to propose changes in the Service Schedule, Service Consists, or Service Fares with respect to the Branch Line Service.

SECTION 2.05.  <u>Service Meetings</u>.  Upon the request of Metro-North or CDOT, service meetings shall be conducted at times and places agreeable to Metro-North and CDOT.  Such meetings will be scheduled at least two weeks in advance, and shall not be required to be held more than once per month except in unusual circumstances.  By written notice to the other parties one week before the scheduled meeting date,

-13-

Metro-North or CDOT may place specific items on the agenda
for such meeting.  In addition, by written notice to MTA and
Metro-North, at least one week before the scheduled meeting
date, CDOT may request that MTA attend any scheduled service
meeting and MTA, if so requested, will attend.

SECTION 2.06.  <u>Provision of Information to CDOT and</u>
<u>MTA</u>.

(a) At such times and locations and under such
advance notice and other procedures as may be agreed upon
from time to time by the parties, CDOT will have access to
Metro-North and MTA personnel, records, reports, payroll
records of Metro-North employees and MTA employees employed
by Metro-North in the Service, studies and other information
concerning the operations and financing of the Service.
Neither CDOT nor the State of Connecticut shall be entitled
to the actual personnel records of any such individual
employee of Metro-North or MTA, but shall only be entitled to
the general results of any disciplinary hearings.  Neither
CDOT nor the State of Connecticut shall have access to any
records or other personal information prohibited by NY Public
Officers Law § 96 (McKinney 1983).  Additionally, neither
CDOT nor the State of Connecticut shall be entitled to infor-
mation which is privileged or proprietary in nature to Metro-
North or MTA and is being or has been prepared by Metro-

North or MTA to defend or assert a case or controversy by or against CDOT or the State of Connecticut unless access to such information is ordered by a court of competent jurisdiction.

(b) At such times and locations and under such advance notice and other procedures as may be agreed upon from time to time by the parties, MTA and Metro-North will have access to CDOT personnel, records, reports, studies and other information concerning the operations and financing of the Service.  MTA and Metro-North shall not be entitled to the actual personnel records of an individual employee of CDOT, but shall only be entitled to the general results of any disciplinary hearings.  MTA and Metro-North shall not have access to any public records, as defined under Conn. Gen. Stat. § 1-18a(d), prohibited from disclosure under Conn. Gen. Stat. § 1-19(b).  Additionally, MTA and Metro-North shall not be entitled to information which is privileged or proprietary in nature to CDOT and is being or has been prepared by CDOT to defend or assert a case or controversy by or against MTA or Metro-North unless access to such information is ordered by a court of competent jurisdiction.

ARTICLE THREE

ALLOCATION AND PAYMENT OF OPERATING DEFICITS

SECTION 3.01.  <u>Main Line</u>.  Commencing as of January 1, 1983, 56.32 percent of the Main Line Net Operating Deficit shall be allocated to and paid by CDOT in the manner set forth in Sections 3.04 and 3.05 hereof and 43.68 percent shall be allocated to and paid by MTA, subject to adjustment pursuant to the timetable of Section 3.04 hereof.

SECTION 3.02.  <u>Branch Lines</u>.  Commencing as of January 1, 1983, one hundred percent (100%) of the Branch Lines Net Operating Deficit shall be allocated to and paid by CDOT in the manner set forth in Sections 3.04 and 3.05 hereof.

SECTION 3.03.  <u>Grand Central Terminal</u>.  Commencing as of January 1, 1983, fifty-three percent (53%) of the Grand Central Terminal Net Operating Deficit shall be allocated to and paid by CDOT in the manner set forth in Sections 3.04 and 3.05 hereof and forty-seven percent (47%) shall be allocated to and paid by MTA.

SECTION 3.04.  <u>Adjustment of Prior Payments</u>. Within 30 days of the date of this Agreement Metro-North shall determine the difference between (i) the amount that would have been payable by CDOT during the period from January 1, 1983 to the date of this Agreement if the

-16-

provisions of Sections 3.01, 3.02 and 3.03 hereof had been in effect during such period and (ii) the amount actually paid by CDOT during such period pursuant to Section 2 of the Interim Service Agreement and as a management fee and fee for the inclusion of the Waterbury Branch in the Service pursuant to Section 3(e) of the Interim Service Agreement. Such determination shall be made in accordance with the principles and procedures set forth in Appendix A hereto. CDOT agrees to pay to Metro-North the amount of such difference within 30 days of CDOT's receipt of such written determination.

SECTION 3.05. <u>General Provisions as to Payments</u>.

(a) Metro-North agrees to provide CDOT on or about the first day of each month with a statement dated such first day of amounts payable by CDOT hereunder in respect of the following month (the "Statement"), computed on the basis of the operating portion of the Approved Budget, adjusted to reflect the deviation between the actual costs and actual revenues for the month two months prior to the date of the Statement and the costs and revenues for such earlier month computed on the basis of the Approved Budget. Metro-North further agrees to provide CDOT with a written explanation in form and content identical to the written explanation provided to the President of Metro-North of the reasons for any significant deviation with respect to the Service in

costs or revenues for such earlier month computed on the
basis of the Approved Budget.  CDOT agrees to pay the amounts
payable as reflected in each Statement within 30 days of
receipt of each statement.

　　　　(b)  Within thirty days of the receipt by Metro-
North from its independent certified public accountants of
their report on the annual financial statements of Metro-
North, Metro-North shall provide CDOT with a statement (the
"Adjusted Statement"), which shall reflect any adjustments in
amounts paid or payable by CDOT hereunder for the period
covered by such audit.  CDOT agrees to pay Metro-North any
amounts payable pursuant to the Adjusted Statement within
thirty days of its receipt.  Any amounts due to CDOT pursuant
to the Adjusted Statement shall be deducted from the amounts
due and payable in the next Statement provided to CDOT by
Metro-North.

　　　　(c)  CDOT shall not be entitled to withhold any
amounts due and payable as set forth in any Statement or
Adjusted Statement.  CDOT shall present all disputed items
in writing to Metro-North with a copy to MTA and shall
include an explanation of the dispute and the basis for such
claim.  CDOT and its outside auditors shall not be permitted
to commence any financial dispute more than eighteen months
following the delivery to CDOT of the Adjusted Statement for

the fiscal year in which the event giving rise to the dispute occurs.  Metro-North shall respond to disputes in writing to CDOT with a copy to MTA within two months of such written notice.  In the event that a dispute is not resolved between Metro-North and CDOT within one month following Metro-North's written response, it shall be submitted for resolution pursuant to the financial arbitration procedure set forth in Section 10.03 of this Agreement.  If a dispute results in a credit to CDOT, Metro-North will credit CDOT with interest for each day from the date of CDOT's written notice of such dispute to the date of crediting.  The parties agree that the rate of interest for purposes of this subsection and subsection (d) below shall be computed at seventy percent (70%) of the Prime Rate.  Nothing in this Section shall act to limit any agency of the State of Connecticut other than CDOT from commencing financial disputes.

(d)  Any overdue amounts payable by CDOT pursuant to this Agreement, including but not limited to any payments determined as a result of the financial arbitration procedure set forth in Section 10.03 of this Agreement to have been withheld improperly, shall accrue interest computed at seventy percent (70%) of the Prime Rate from the due date until the date of payment.  Accrued and unpaid interest shall be computed by Metro-North and reflected in each monthly

-19-

Statement submitted by Metro-North to CDOT, which monthly
Statements shall include a separate calculation of the unpaid
interest, if any, included in such Statements.

ARTICLE FOUR

CLASSIFICATION AND ACQUISITION
OF CAPITAL ASSETS

SECTION 4.01.  <u>Classification of Capital Assets</u>.
The determination of what constitutes a Capital Asset, the
determination of the Capital Costs of a Capital Asset, the
classification of a Capital Asset as a Moveable Capital Asset
or a Nonmoveable Capital Asset (in accordance with the
definitions of such terms contained herein), and all
decisions as to the location of Capital Assets shall be made
by Metro-North subject to the right of MTA or CDOT to submit
the propriety of the decision to arbitration pursuant to the
provisions of Section 10.03 below.

SECTION 4.02.  <u>Future Acquisition of Nonmoveable
Capital Assets</u>.

(a)  The decision to acquire Nonmoveable Capital
Assets to be located in Connecticut shall be the respon-
sibility of CDOT, provided, however, that Metro-North shall
(1) be given notification of such decision at least 120 days
prior to purchase, (2) advise CDOT if the planned purchase is
not expected to mesh operationally with the Service or if it

-20-

will require a substantial modification to the physical plant
of the Main Line which can be expected to result in increased
maintenance and/or operational costs, and (3) not be required
to provide Metro-North forces to perform work associated with
such a purchase during any period when it has no forces
reasonably available.

(b)  The decision to acquire Nonmoveable Capital
Assets to be located in New York shall be the responsibility
of MTA and Metro-North provided, however, that CDOT shall
be given notification of such decision at least 120 days
prior to purchase and shall be advised if the planned pur-
chase is not expected to mesh operationally with the Service
or if it will require a substantial modification to the
physical plant of the Main Line which can be expected to
result in increased maintenance and/or operational costs.

SECTION 4.03.  Future Acquisition of Moveable
Capital Assets.

(a)  The decision to acquire Moveable Capital
Assets which in the judgment of Metro-North will be used
primarily in operating the Branch Line Service shall be the
responsibility of CDOT, provided, however, that Metro-North
shall (1) be given notification of such decision at least 120
days prior to purchase, (2) advise CDOT if the planned pur-
chase is not expected to mesh operationally with the Service

or if it will require a substantial modification to the
physical plant of the Main Line which can be expected to
result in increased maintenance and/or operational costs, and
(3) not be required to provide Metro-North forces to perform
work associated with such a purchase during any period when
it has no forces reasonably available.

(b)  The decision to acquire all Moveable Capital
Assets other than those provided for in paragraph (a) above
shall be made in accordance with the provisions of Section
6.06 hereof.

(c)  Notwithstanding the foregoing, CDOT shall have
the right to purchase and pay for 100% of the costs of any
Moveable Capital Asset for the Main Line provided that the
purchase will not impair the safety of operations or the
health or safety of the workers and provided further that
CDOT provides notification to MTA and Metro-North at least
120 days prior to purchase.

SECTION 4.04.  Capital Projects.  Metro-North or
MTA shall let all contracts, and Metro-North shall schedule
the performance of and manage all projects for capital
improvements on and the acquisition of Capital Assets for
the Service regardless of the state in which any project or
any Capital Asset is to be located, provided, however, that
CDOT shall have the right at its election to let, schedule or

-22-

manage any project located solely within the State of Connec-
ticut and provided further that CDOT shall have the right to
require that interstate projects be divided along state lines
into two projects whenever CDOT desires to let, schedule and
manage the Connecticut portion of the work.

ARTICLE FIVE

ALLOCATION AND PAYMENT OF CAPITAL COSTS

SECTION 5.01.   <u>Nonmoveable Capital Assets</u>.   Com-
mencing as of January 1, 1983, one hundred percent (100%) of
the Capital Costs of all Nonmoveable Capital Assets located
in the State of New York shall be allocated to and paid by
MTA and one hundred percent (100%) of the Capital Costs of
all Nonmoveable Capital Assets located in the State of Con-
necticut shall be allocated to and paid by CDOT.

SECTION 5.02.   <u>Moveable Capital Assets</u>.

(a)   Commencing as of January 1, 1983, whenever a
Moveable Capital Asset is purchased for use in whole or in
part on the Service ("Service Use"), if in Metro-North's
judgment the Service Use of such asset will be primarily on
the Branch Lines, the Service's share of the Capital Costs of
such Moveable Capital Asset (computed in conformance with
paragraph (b) below) shall be paid one hundred percent (100%)
by CDOT.

(b)   Commencing as of January 1, 1983, sixty-three

-23-

percent (63%) of the Service's share of the Capital Cost of

all Moveable Capital Assets other than those provided for in

paragraph (a) above shall be paid by CDOT and thirty-seven

percent (37%) shall be paid by MTA.  The Service's share of

the Capital Cost of all Moveable Capital Assets which are

purchased to serve the entire Metro-North system shall be the

Capital Cost of such asset multiplied by a fraction the

numerator of which shall be the total operating expenses of

the Service for the year prior to the year in which the

acquisition is agreed upon and the denominator of which shall

be the total operating expenses of Metro-North for the com-

parable period, excluding payments associated with the direct

costs of the service operated by the New Jersey Transit

Corporation.  Once the determination is made, there shall be

no subsequent change in the portion of the Capital Cost of

such asset charged to the Service as a result of changes in

the ratio set forth in the preceding sentence in years sub-

sequent to the year used for such determination.

     (c)  Notwithstanding Section 5.01(b), CDOT shall

pay 100% of the cost of any Moveable Capital Asset purchased

for the Main Line pursuant to Section 4.03(c).

     (d)  Nothing in this Section 5.02 shall preclude

CDOT and MTA, from the date of execution of this Agreement,

on a case-by-case basis, from varying their respective per-

centage Allocations by prior written agreement for any reason including to take full advantage of favorable taxation or funding provisions including but not limited to the Safe Harbor Leasing Provisions of the Internal Revenue Code added by Section 201 of the Economic Recovery Tax Act of 1981 as Section 168(f)(8) and preserved by transition rule for mass commuting vehicles in Section 208(e) of the Tax Equity and Fiscal Responsibility Act of 1982 (the "Safe Harbor Leasing Provisions") or from making such other adjustments as may be necessary.

SECTION 5.03.  <u>CDOT Payment of Capital Costs</u>.  At the time the determination is made that a Nonmoveable Capital Asset to be located in Connecticut or a Movable Capital Asset (other than one purchased pursuant to Section 4.03(c) above) is to be acquired, MTA and CDOT shall agree to an appropriate payment schedule for CDOT's share of the Capital Cost of such asset.

SECTION 5.04.   <u>General Provisions as to Payments</u>. Amounts payable by CDOT pursuant to Sections 5.01, 5.02 and 5.03 hereof shall be reflected in the Statements submitted to CDOT by Metro-North pursuant to Section 3.05 hereof and shall be paid as set forth in such Section.

SECTION 5.05.  <u>Adjustment of Prior Payments</u>. Metro-North shall determine the difference between (i) the

amount that would have been payable by CDOT during the period
from January 1, 1983 to the date of this Agreement in respect
of the cost of all Moveable and Nonmoveable Capital Assets
if the provisions of Sections 5.01 and 5.02 hereof had been
in effect during such period and (ii) the amount actually
paid by CDOT with respect to such assets during such period.
Such determination shall be made in accordance with the
principles and procedures set forth in Appendix A hereto.
CDOT agrees to pay to MTA the difference so determined within
30 days of such determination.

ARTICLE SIX

SERVICE FINANCES AND BUDGET PROCESS

SECTION 6.01.  Accounts.  Metro-North shall main-
tain a chart of accounts reasonably designed to reflect its
costs and revenues (the "Accounts") against which all Service
Revenues shall be credited and all Service Costs shall be
charged.  The Accounts, the form of which is set forth in
Appendix A, shall be maintained in accordance with the
accounting principles set forth in Appendix A hereto.  The
decision of what constitutes an item of Service Revenue or
Service Cost shall be determined by Metro-North and the
independent certified public accountants engaged by Metro-
North in connection with the annual examination of Metro-
North financial statements, consistent with Appendix A

hereto, provided however that the determination shall be subject to arbitration pursuant to the terms of Section 10.03 below.

Metro-North shall have the right to revise the form and content of the Accounts provided that such revisions are consistent with the accounting principles set forth in Appendix A hereto and provided further that the allocation of costs to the Service and to the Branch Lines Net Operating Deficit, Main Line Net Operating Deficit and Grand Central Terminal Net Operating Deficit is consistent with the cost allocations set forth in Appendix A hereto. Prior to revising the content of the Service Accounts, Metro-North shall give CDOT 120 days advance notice of major and 90 days advance notice of less significant proposed revisions. CDOT shall have 60 days from such notice to reject the proposed revisions. If the revisions are not rejected within 60 days Metro-North shall be authorized to implement them as soon thereafter as it deems appropriate. If the revisions are rejected in whole or in part, the disputed revisions shall be subject to arbitration pursuant to Section 10.03 hereto. Nothing in this Agreement shall be deemed to prohibit Metro-North in its discretion from making insignificant or immaterial revisions to the Accounts.

-27-

SECTION 6.02.  <u>Service Revenues</u>.  Service Revenues shall include:  (1) all revenues of Metro-North allocated to the Service in accordance with Appendix A hereto and (2) all revenues of MTA and CDOT reasonably allocable to the Service in accordance with Appendix A hereto.

SECTION 6.03.  <u>Service Costs</u>.  Service Costs shall include all costs of Metro-North allocated to the Service in accordance with Appendix A hereto.

SECTION 6.04.  <u>Annual Budget Process</u>.

(a)  At the request of CDOT, MTA or Metro-North at any time after August 15 of each year, all of the parties shall meet to discuss concerns and potential problems that the requesting party forsees in the budgets being prepared for the following calendar year in an effort to have those concerns and problems addressed in the proposed budgets.

(b)  Prior to October 1 of each year, Metro-North shall submit to the MTA and CDOT detailed annual budgets for the Service reflecting anticipated Service Revenues and Service Costs associated with the Service for the following calendar year including the Capital Costs of Capital Assets as set forth in Section 6.06 below.  Thereafter, MTA, CDOT and Metro-North shall consult with respect to said budgets. On or before December 1 of each year CDOT shall indicate to MTA and Metro-North its approval or disapproval of such

proposed budgets, or the proposed budgets as revised and
accepted by Metro-North as a consequence of the process of
consultation.  If by December 1 of each year CDOT has not
rejected the proposed budget it shall be deemed approved by
CDOT unless MTA shall reject the proposed or revised budget
as set out below.

On or before November 15 of each year MTA staff
shall inform CDOT of its preliminary position with respect to
the proposed budgets, or the proposed budgets as revised and
accepted by Metro-North, as a consequence of the process of
consultation.  MTA shall approve or disapprove the proposed
or revised budgets by formal action taken by its Board of
Directors on or before December 31 of each year.  If the
proposed budgets are disapproved by MTA, it shall notify CDOT
and Metro-North of such disapproval and the parties shall ·
consult with each other in order to attempt to resolve the
issues causing MTA's disapproval of the proposed budget.

(c)  Metro-North may request the modification of an
Approved Budget at any time.  MTA and CDOT shall have the
right at any time by mutual agreement to modify an Approved
Budget.  Metro-North shall present to CDOT all modified
budgets it proposes but shall only be required to present a
modified budget at such time as Metro-North believes that the
actual operating expenses for the year will exceed the amount

of the Approved Budget by ten percent (10%).   Nothing in this
Section 6.04 shall be deemed to prohibit Metro-North from
charging costs incurred by it in good faith in fulfilling its
obligations to operate the Service.

(d)   In the event Metro-North's budget is disap-
proved Metro-North shall be permitted to budget and expend in
accordance with the budget for the preceding year, plus such
increases as may be required by labor contracts and general
increases in the costs of goods and services, as reflected in
the Consumer Price Index published for the New York
Metropolitan region.

SECTION 6.05.   Quarterly Financial Review Meetings.
Upon the request of Metro-North or CDOT, Metro-North will
conduct financial review meetings at times and places
agreeable to all parties.   Such meetings shall be scheduled
by Metro-North at least two weeks in advance and shall not be
required to be held more than quarterly.   By written notice
to the other parties one week before the scheduled meeting
date, any party may place specific items on the agenda for
such meeting.   By written notice to MTA and Metro-North, CDOT
may request that MTA attend any scheduled financial review
meeting and MTA, if so requested, will attend.

SECTION 6.06.   Capital Budget Process.   Upon the
request of Metro-North, MTA or CDOT, Metro-North, CDOT and

-30-

MTA will meet to discuss a schedule for preparation by Metro-North of a Service capital plan, to establish procedures for review of proposed capital projects by CDOT and MTA, and to coordinate funding efforts in accordance with the provisions of Article Five on the allocation of Capital Costs.  Such meetings shall be scheduled by Metro-North at least two weeks in advance and shall not be required to be held more than quarterly.  Metro-North will submit to CDOT for approval according to the schedule set forth in Section 6.04 above an annual capital budget for (1) all Moveable Capital Assets and (2) all Nonmoveable Capital Assets located in Connecticut.

SECTION 6.07.  Prior Operating and Capital Expenses.  All operating and capital expenses and Capital Costs incurred or to be incurred by Metro-North for the benefit of the Service from January 1, 1983 to and including December 31, 1984 are hereby deemed to have been approved by MTA and CDOT.  Disputes arising in connection with such approved expenses and capital costs shall be resolved in accordance with the procedures set forth in Section 3.05 above.

SECTION 6.08.  Five-Year Capital Plan.  Not later than December 31, 1985 and at subsequent five year intervals, the parties to this Agreement shall develop a five-year

capital plan for the Service which shall be updated on an
annual basis in the years in which no new five-year plan is
developed.  Each five-year plan shall describe, to the extent
feasible, all plans for the acquisition of all Moveable
Capital Assets for the Service, including but not limited to
those Moveable Capital Assets which will be used in operating
the Service for the Branch Lines, and all Nonmoveable Capital
Assets, whether located in Connecticut or New York.

ARTICLE SEVEN

ASSET OWNERSHIP AND MANAGEMENT

SECTION 7.01.  <u>Title to Assets</u>.  The parties agree
that MTA shall have all right, title and interest in and to
all present and future Nonmoveable Capital Assets located in
the State of New York (provided, however, that MTA shall have
the right in its sole discretion to place all right, title
and interest in and to any such asset or assets in Metro-
North), CDOT shall have all right, title and interest in and
to all present and future Nonmoveable Capital Assets located
in the State of Connecticut provided, however, that in the
event of termination of this Agreement, the question of the
appropriate reimbursement to any party for its contribution
to the Capital Cost of a Nonmoveable Capital Asset in its
non-home state purchased prior to January 1, 1983 or trans-
ferred by Conrail shall be resolved pursuant to Section 12.05

-32-

hereof.  The parties further agree that Metro-North shall own
all existing and future Moveable Capital Assets, except that
the ownership of all existing rolling stock shall be deter-
mined and resolved as part of the asset management review set
forth in Section 7.02 and that the ownership of all future
rolling stock shall be determined on a case-by-case basis in
a manner designed to permit CDOT and MTA to utilize to full
advantage the Safe Harbor Leasing Provisions of the Internal
Revenue Code or other favorable taxation or other provisions
of law.

SECTION 7.02.  <u>Asset Management Review</u>.  MTA and
CDOT agree to undertake a joint analysis and review of the
management of all Capital Assets of the Service, whether such
assets are owned or leased by MTA, CDOT or Metro-North or any
combination thereof.  The objective of the asset management
review will be to identify, attribute ownership of or other
interest in, and catalogue all Capital Assets which are used
by, or useful to, the Service, and to establish a process by
which the management and utilization of such assets can be
enhanced.  The review will encompass all Capital Assets,
including equipment, machinery and rolling stock owned or
leased by MTA, CDOT, Metro-North, the New Haven Line or any
combination thereof or otherwise conveyed to Metro-North, MTA
(with respect to the New Haven Line), CDOT (with respect to

the New Haven Line) or any combination thereof under the
provisions of NERSA.  The asset management review will be
performed by joint CDOT and MTA teams.  CDOT and MTA will
each designate a coordinating project leader, who will serve
as the key project leader from each authority.  In addition,
MTA and CDOT shall designate their respective members of the
team including all individuals necessary to complete the
analysis.  The scope of work, methodology and workplan for
the completion of the asset management review is to be agreed
upon by representatives of MTA and CDOT.  Neither Metro-
North, MTA nor CDOT shall have any obligation to reimburse
any other party to this Agreement for any Capital Assets
which the asset management review teams conclude have been
destroyed or cannot be located.  The parties agree to pursue
jointly any claims they may have against third parties with
respect to such assets.

## ARTICLE EIGHT

### LABOR

SECTION 8.01.  Labor Negotiations.  CDOT shall have
full rights of consultation in all stages of labor nego-
tiations involving Metro-North and shall have the right to
have a representative sit in on all bargaining sessions with
the unions involved in such labor negotiations according to
reasonable procedures to be agreed upon by the parties.  If

-34-

CDOT demonstrates by clear evidence that Metro-North has agreed to a labor contract modification which does not benefit Metro-North as constituted on the date of this Agreement but was agreed to for the purpose of conferring a benefit on another MTA operating agency, CDOT shall be entitled to a proportional annual credit.  Unless otherwise agreed to by MTA and CDOT, CDOT shall enforce such alleged entitlement only in an action brought in federal court.

ARTICLE NINE

PRODUCTIVITY REVIEW

SECTION 9.01.  <u>Productivity Review</u>.  The parties agree to undertake a joint comprehensive one-time review of the Service, in an effort to improve the efficiency of the Service.  The productivity analysis shall encompass all activities, costs and revenues which are attributable to the Service.  The scope of this analysis shall include the following Metro-North departments or functions:

- Transportation

- Maintenance of Equipment

- Maintenance of Way

- Passenger Service

- Finance and Accounting

- Management Information Systems

- Legal/Claims/Insurance

-35-

—

— Planning

- Planning
- Personnel/Labor Relations
- Budget
- Public Affairs
- Contract Management

The objective of the productivity analysis will be to iden-
tify areas where service can be improved, costs reduced and
revenue enhanced on the Service; and to develop a process
to implement opportunities identified during the analysis.
Such review will be conducted by joint MTA and CDOT teams.
CDOT and MTA shall each designate a coordinating project
leader, who will serve as the key project leader from each
authority.  In addition, MTA and CDOT will designate those
individuals necessary to complete the analysis.  The final
scope, methodology and work plan for completion of the
productivity review are to be agreed to by the designated
representatives of MTA and CDOT.  Any party may utilize the
services of a consultant or consultants at its own expense
to assist its staff in such review.

SECTION 9.02.  Resolution of Disputes Relating to
the Productivity Review.  In the event of any dispute relat-
ing to the productivity review initiated pursuant to Section
9.01, the Chairman of MTA and Commissioner of CDOT shall meet
in an effort to resolve such dispute.

-36-

—

ARTICLE TEN

ARBITRATION

SECTION 10.01.  <u>Settlement of Disputes</u>.  Each of the parties hereto shall make every reasonable effort to settle any dispute arising out of this Agreement without resorting to arbitration.

SECTION 10.02.  <u>Arbitration Procedure</u>.  Subject to the provisions of Sections 10.03, 10.04 and 10.05, any claim or controversy between MTA and CDOT relating to the meaning of this Agreement or any provision hereof or relating to an alleged breach hereof which cannot be resolved pursuant to the provisions of Section 10.01 hereof shall be submitted by MTA and CDOT to binding arbitration as follows: (i) either MTA or CDOT shall notify the other of its intention to arbitrate; (ii) such notice shall include a detailed statement of the subject matter of the arbitration and shall designate one arbitrator; (iii) within 15 days after such notification, the notified party shall designate a second arbitrator and shall notify the party seeking arbitration of such designation; (iv) within 15 days after the designation of the second arbitrator, the two arbitrators so designated shall appoint a third arbitrator, except that if a second arbitrator has not been designated as provided in clause (iii), no arbitrator other than the one first named need be

-37-

designated (and except that in the event of the failure of
the two arbitrators thus named to agree upon a third within
20 days after their appointment, then the third arbitrator
shall be appointed by the President of the American
Arbitration Association at the request of either MTA or CDOT
or, if such President shall refuse to do so, by such other
person or in such other manner as MTA and CDOT may agree);
(v) the arbitrators, or if a second arbitrator is not desig-
nated as provided in clause (iii), the arbitrator, shall
promptly proceed to receive such submissions and evidence
from MTA and CDOT as they may decide are relevant to the
determination to be made and hear and decide the issue or
issues submitted to them giving to each party reasonable
notice of the time and place of hearing; (vi) the
arbitrators, or a majority of them, shall promptly make their
decision and award in writing, serving a copy on each of the
parties, and such decision shall be final, binding and con-
clusive upon the parties and may be enforced by the parties
and entered in the appropriate federal court.  In such
arbitration, the procedures of the American Arbitration
Association Rules of Commercial Arbitration shall govern to
the extent not inconsistent with the foregoing.  Each party
to the arbitration shall bear its respective share of the
cost of any arbitration pursuant to this section, with the

joint costs of such arbitration to be paid in a proportion
determined by the arbitrators panel.  The arbitration proce-
dures set forth in this section shall not apply to any finan-
cial dispute arbitrated pursuant to Section 10.03 below.

SECTION 10.03.  <u>Financial Arbitration Procedure</u>.
Any claim or controversy relating to (i) the calculation of
the amounts payable by CDOT pursuant to Sections 3.04 and
3.05 of this Agreement, (ii) the classification of Capital
Assets pursuant to Section 4.01 of this Agreement, (iii) the
calculation of payments pursuant to Sections 5.04 and 5.05 of
this Agreement, and (iv) the decision as to what constitutes
a Service Revenue or Service Cost pursuant to Section 6.01 of
this Agreement shall be resolved by the expedited Financial
Arbitration Procedure set forth in this Section.

An arbitrator mutually acceptable to Metro-North,
MTA and CDOT shall be designated as the sole arbitrator to
resolve all disputes subject to this procedure.  Metro-North,
MTA and CDOT may by unanimous agreement remove such
arbitrator and select a replacement at any time with or
without cause.  In the event that an arbitrator is not desig-
nated by the parties at the time a claim or controversy
arises which is subject to arbitration pursuant to this
Section, the parties shall have 30 days within which to
mutually agree on a designee at the end of which period if no

-39-

arbitrator has been so designated, an arbitrator with exper-
tise in railroad accounting and administration shall be
selected by the President of the American Arbitration
Association and shall preside until the dispute for which he
was appointed is resolved.  Following resolution of such
dispute, the arbitrator selected by the American Arbitration
Association may be removed by any party in its sole dis-
cretion with or without cause.  In the event that the
arbitrator no longer wishes to serve as arbitrator, the
arbitrator shall designate a successor subject to the unani-
mous consent of MTA, CDOT and Metro-North, which consent
shall not be unreasonably withheld.  If the arbitrator is
unavailable to designate a successor, MTA, CDOT and Metro-
North shall meet within 30 days to confer in good faith to
name a mutually acceptable successor.  All disputes subject
to the procedure shall be submitted to hearing within 30 days
of the raising of the disputes.  There shall be no pre- or
post-hearing submissions unless the arbitrator requests or
both MTA and CDOT agree upon such submissions in which case
they shall be submitted by both MTA and CDOT, and no practic-
ing lawyers (including inside counsel) shall participate at
the hearing unless the arbitrator requests or both MTA and
CDOT agree upon such participation in which case lawyers for
both MTA and CDOT may participate.

-40-

Any amount in dispute pursuant to Sections 3.04, 3.05, 5.04 and 5.05 hereof shall be paid to Metro-North and held in escrow pending the resolution of the dispute. Such amount shall be deposited in a financial institution acceptable to MTA and CDOT, shall bear interest at the highest overnight investment rate obtainable from such institution and shall be divided between the parties to the financial dispute in proportion to the final arbitration award as specified by the arbitrator. All decisions shall be rendered within 30 days of the hearing and such decisions shall be binding and conclusive upon the parties and entered in the appropriate federal court. Each party to the arbitration shall bear its respective share of the cost of any arbitration pursuant to this section, with the joint costs of such arbitration to be paid in a proportion determined by the arbitrator.

SECTION 10.04. <u>Arbitration Awards</u>. Any arbitration award hereunder shall be limited to an award of damages, or a declaration of the rights of the parties hereunder, or both. No award shall enjoin any party hereto or otherwise operate in such a way as to require specific performance by any party hereto of any act or of any obligation hereunder.

SECTION 10.05.  <u>Certain Matters Not Subject to Arbitration</u>.  Notwithstanding anything to the contrary herein contained, except as so provided in Section 10.03 above and 13.08 below, no claim or controversy arising from the provisions of Section 2.04(a), (b) or (c), Articles Three, Five, Eight or Nine or Section 6.04 hereof including the defined terms as used therein shall be submitted to arbitration.

SECTION 10.06.  Enforcement of Awards.  Any party hereto may enforce any arbitration award issued pursuant to Sections 10.02 and 10.03 of this Agreement in any court of general jurisdiction of the State of Connecticut or the State of New York or any United States District Court located in the State of Connecticut or the State of New York.

## ARTICLE ELEVEN

## CLAIMS

SECTION 11.01.  Claims Prior to January 1, 1983. All damages or claims or other liabilities or Service Revenues with respect to third parties under the Service Agreement or with respect to the service which arise or relate to periods prior to January 1, 1983 are deemed to be Service Costs or Service Revenues of the Service and are agreed to be paid, in the case of Service Costs, or received, in the case of Service Revenues, fifty percent (50%) by CDOT

-42-

and fifty percent (50%) by MTA.

SECTION 11.02.  <u>Claims After January 1, 1983</u>.  All damages or claims or other liabilities or Service Revenues with respect to third parties under this Agreement or with respect to the Service for the periods between January 1, 1983 and the date upon which this Agreement is terminated are deemed to be Service Costs or Service Revenues of the Service and are agreed to be paid, in the case of Service Costs, or received, in the case of Service Revenues, by CDOT and MTA in proportion to their respective Allocations as they may from time to time be revised pursuant to Section 12.03 hereof.

SECTION 11.03.  <u>Certain Claims Arising Out of Incidents Involving the Service and Other Railroad Transportation Operated by Metro-North</u>.  In the event of a claim arising out of a collision or other accident between equipment or vehicles operated on behalf of the Service and other equipment or vehicles operated by Metro-North other than on behalf of the Service the cost of repair and claims shall be apportioned 50% to the Service Accounts and 50% to the Non-Service accounts.  In the event of a collision or other accident involving equipment or vehicles operated by or under the control of Metro-North and any other carrier, the liability of Metro-North shall be governed by the terms of agreements, if any, with the carrier, and the Service shall

bear its proportionate share of such liability as such costs
are allocable to the Service.  As used in this Section 11.03
only, Non-Service refers to the Harlem Line and Hudson Line
Service and Branch Line Service.

SECTION 11.04.  <u>Selection of Counsel for the
Litigation of Claims</u>.  Metro-North shall have the unilateral
right to select and direct counsel for the litigation of
claims arising out of the operation of the Service, provided
however that in the event of a claim arising solely out of
Branch Line Service, Metro-North shall confer with CDOT and
Metro-North's selection of counsel shall be subject to the
consent of the State of Connecticut, which consent shall not
be unreasonably withheld.  Consent will be deemed given
unless the State of Connecticut objects to the selection of
counsel within 7 business days from the date CDOT is informed
of Metro-North's selection.  The State of Connecticut reser-
ves the right to be represented by the Attorney General of
the State of Connecticut or by counsel appointed by the
Attorney General in any proceeding in which the State of
Connecticut or CDOT is a named party.  In the event of a
claim arising out of Branch Line Service, except for claims
by employees, CDOT has the sole right to approve or disap-
prove all claims proposed to be settled for an amount in
excess of $50,000 and to direct that such claims be settled.

ARTICLE TWELVE

DURATION OF THE AGREEMENT

SECTION 12.01. <u>Effective Date</u>. The provisions of this Agreement are effective as of January 1, 1983.

SECTION 12.02. <u>Term</u>. The term of this Agreement shall be seven years commencing on the Effective Date hereof.

SECTION 12.03. <u>Renewal</u>. The initial seven-year term of this Agreement shall be extended automatically for additional consecutive 5-year terms as each successive term expires, subject to the termination provisions set forth in Section 12.04 hereof. At least one year prior to the expiration of the initial term and any successive renewal term, MTA and CDOT shall each have the right to request renegotiation of the Allocations. In the event that such a request is made, MTA and CDOT shall meet promptly in an attempt to adjust the Allocations in a fair and equitable manner for the next renewal term.

In the event that MTA and CDOT have not mutually agreed to allocations for the next renewal term eight months before the expiration of the existing term, they shall submit the question of fair and equitable allocations for the next renewal term to arbitration. Such arbitration shall be conducted and the arbitrators therefor shall be designated or appointed in the manner provided in Section 10.02. All

-45-

determinations, decisions and other actions of such arbitrators shall be final, binding and conclusive on the parties and may be enforced by the parties and entered in the appropriate federal court.

SECTION 12.04.   Termination Rights.   MTA and CDOT shall each have the right to terminate this Agreement by notifying the other parties hereto in writing at least 18 months prior to the desired termination date.   Any party hereto shall also have the right to terminate this Agreement 90 days after notifying any other party of such other party's default hereunder, and such notified party's failure to cure such default prior to the expiration of such 90 day period.

SECTION 12.05.   Procedures Upon Termination.

(a)  In the event that this Agreement is terminated pursuant to the first sentence of Section 12.04 hereof, the parties agree to negotiate in good faith and, failing agreement, to submit to arbitration no later than one year prior to the time such termination is to become effective, the questions of (1) an appropriate, fair and equitable allocation between MTA and Metro-North, on the one hand, and CDOT, on the other hand, of Moveable Capital Assets; (2) a fair and equitable reimbursement, when appropriate, to MTA for its contributions toward Nonmoveable Capital Assets purchased prior to January 1, 1983 located in Connecticut and

titled to the State of Connecticut or CDOT and a fair and
equitable reimbursement, when appropriate, to CDOT for its
contributions towards Nonmoveable Capital Assets purchased
prior to January 1, 1983 located in New York and titled to
MTA or Metro-North; (3) an appropriate, fair and equitable
arrangement for access by CDOT to books and records and
intellectual property, in each case to the extent used in the
Service, for the purpose of enabling each of MTA and Metro-
North, on the one hand, and CDOT, on the other hand, to
operate a rail passenger service; and (4) a fair and equi-
table allocation between MTA and Metro-North, on the one
hand, and CDOT, on the other hand, of the costs of ter-
mination.  In the event that this Agreement is terminated
pursuant to the second sentence of Section 12.04 hereof, the
parties agree to submit the same matters to arbitration as
soon as practicable but in no event later than 30 days after
notice of termination is given by a party hereto.

Such arbitration shall be conducted, and the
arbitrators therefor shall be designated or appointed, in the
manner provided in Section 10.02 and all determinations,
decisions and other actions of such arbitrators shall be
final, binding and conclusive on the parties and may be
enforced by the parties and entered in the appropriate
federal court.

The parties agree that in the event of termination
the title to Administrative Assets acquired from Conrail
during the transition shall be the subject of arbitration.
The parties further agree, with respect to Administrative
Assets purchased by the parties to this Agreement, that the
party which has paid the greatest percentage of the Capital
Costs (including the Service share as computed pursuant to
Section 5.02(b) above and the non-Service share) of such
Administrative Asset shall be entitled to a right of first
refusal as to such Administrative Asset which, if exercised
will require payment to the remaining party or parties of
their respective share of the depreciated book value of such
Administrative Asset.  If the party with the greater percent-
age payment for such Administrative Asset fails to exercise
its purchase right, the remaining party or parties will have
a right of refusal according to the same terms of purchase.
If no party exercises a right of purchase, the parties agree
that the Administrative Asset will be sold, with the proceeds
to be divided among the parties in proportion to their
original payment of Capital Costs.

In the event of termination, nothing in this Agree-
ment is to be construed to augment or diminish the right of
access, if any, of any party hereto to property of any other
party to the extent such right existed as of December 31,

1982.  Any determination of such rights shall take into
account such agreements, easements and other enforceable
rights as were in effect on December 31, 1982 including but
not limited to the GCT Joint Facilities Agreement dated
October 27, 1970.

(b)  Within 30 days of the completion of the first
annual audit following termination of this Agreement Metro-
North shall provide to CDOT a statement setting forth the
difference, if any, between the monthly amounts paid in
advance by CDOT pursuant to Section 3.05(a) and the amounts
then owing by CDOT based on actual Service Costs and Service
Revenues for the period prior to termination as reflected in
the annual audit.  Within 30 days of the receipt of such
statement, either CDOT shall pay to Metro-North the dif-
ference, if any, between the amounts so paid and the amounts
required to be paid or Metro-North shall refund any excess
payment to CDOT, in either case with interest calculated at
seventy percent (70%) of the Prime Rate from the date of
termination to the date of payment.  Disputes arising under
this sub-section (b) shall be submitted to the arbitration
panel convened pursuant to Section 12.05(a) above.

(c)  The rights, obligations and duties of the
parties under Article Eleven hereof and this Section 12.05
shall survive termination of this Agreement.

ARTICLE THIRTEEN

MISCELLANEOUS

SECTION 13.01.  <u>Notices</u>.  Any request, demand, authorization, direction, notice, consent, waiver, or other document provided or permitted by this Agreement to be made upon, given or furnished to, or filed with one party by another party shall be in writing and shall be delivered by hand or by deposit in the registered mails of the United States, postage prepaid, in an envelope addressed as follows:

If to CDOT:

    Connecticut Department of Transportation
    24 Wolcott Hill Road, P.O. Drawer A
    Wethersfield, Connecticut 06109
       Attention:  Commissioner

If to Metro-North:

    Metro-North Commuter Railroad Company
    347 Madison Avenue
    New York, New York  10017
       Attention:  President

If to MTA:

    Metropolitan Transportation Authority
    347 Madison Avenue
    New York, New York  10017
       Attention:  Chairman

Each party hereto may change the address at which it shall receive notification hereunder by notifying the other parties hereto of such change.  In the event that notice is sent by registered mail, it shall be presumed to be effective three

days after it is deposited in the registered mails of the
United States.

SECTION 13.02.  <u>Office Space</u>.  Metro-North agrees
to provide CDOT with suitable office space at Metro-North's
headquarters for CDOT's use in performing the review and
approval functions set forth in this Agreement.

SECTION 13.03.  <u>Governmental and Court Approval</u>.
Whenever under the terms hereof a party hereto is required to
act or to cease to act, and such act or cessation is subject
to the approval or consent of a governmental agency not a
party to this Agreement or of a court, the party required to
act or cease acting shall be deemed to have complied with
such requirement if, prior to the expiration of the time when
it was to have acted or ceased acting, it shall have applied
to such governmental agency or court for such approval or
consent and shall continue to use its best efforts to achieve
such approval or consent without delay.

SECTION 13.04.  <u>Force Majeure</u>.  The obligations of
the parties hereunder other than the obligations to make
payments shall be subject to Force Majeure which shall
include labor work stoppages, slowdowns, demonstrations or
other similar labor protest actions.

SECTION 13.05.  <u>Successors and Assigns</u>.  All
covenants and obligations of the parties hereunder shall bind

their successors and assigns whether or not expressly assumed by such successors and assigns.

SECTION 13.06.  <u>Past Agreements</u>.  It is the intent of the parties that this Amended and Restated Service Agreement shall supersede and take precedence over all previous agreements between CDOT and MTA, or CDOT and Metro-North, or among MTA, CDOT, and Metro-North, to the extent such agreements are inconsistent herewith or are no longer relevant to the Service.  Without limiting the effectiveness of the preceding sentence, it is specifically intended that this Agreement shall supersede and take precedence over the Service Agreement and all other previous agreements and understandings relating to the definition of the Service, the operation of the Service, the preparation and approval of budgets, the allocation of Service costs and revenues between CDOT and MTA, and the payment of operating deficits.

The provisions of the M-4 Rail Car Agreement and the Bombardier Rail Car Agreement, both between MTA and CDOT and both dated January 31, 1984, relating to payment of interest by CDOT to MTA remain in full force and effect.  The parties shall meet within 30 days to determine whether other agreements, contract amendment letters and contract administration letters shall be effective in accordance with the standards set forth in this Section.  During such period

if there is disagreement between MTA and Metro-North on the one hand and CDOT on the other as to the status of an agreement, contract amendment letter or contract administration letter, its status shall be submitted to arbitration pursuant to Section 10.02 hereof within 60 days of the date of this Agreement.  No agreement, contract amendment letter or contract administration letter shall be effective unless such status is agreed to by the parties or unless it is determined to be effective as a result of arbitration.

SECTION 13.07.  Future Agreements.  The parties hereto agree that they will continue to have the right from time to time to enter into contract amendment letters and contract administration letters by mutual agreement as the need arises to ensure the smooth operation of the Service.

SECTION 13.08.  Connecticut Express Waiver of Sovereign Immunity.  The State of Connecticut expressly waives sovereign immunity with respect to any claims or proceedings that may be commenced by MTA or Metro-North with respect to monies claimed to be due and owing from the State of Connecticut under the terms of this Agreement or any arbitration award issued pursuant hereto.  The parties expressly agree that MTA or Metro-North in its sole discretion may elect to submit any claim or controversy whatsoever for the payment of money with respect to Connecticut

arising out of this Agreement to arbitration under the arbitration procedures set forth in Section 10.02 above, including those claims or controversies which would otherwise be excluded from arbitration pursuant to Section 10.05 hereof.  The parties further agree that in the event of arbitration MTA or Metro-North, as the case may be, shall be entitled to enforce such award in court proceedings and that the express waiver of sovereign immunity provided herein is specifically applicable to such enforcement proceedings if required as a prerequisite to jurisdiction.  The parties recognizing the substantial interests of the State of New York represented in this Agreement agree further that MTA or Metro-North may, in its sole discretion, institute any judicial proceedings otherwise permitted under this Section in the courts of the State of New York.

SECTION 13.09  Connecticut Non-Discrimination Statute and Executive Orders.

(a)  Executive Order No. 3.  There are incorporated in this Agreement by reference, to the extent, if any, that they are determined to be applicable, the provisions of Executive Order No. 3 of Governor Thomas J. Meskill (June 16, 1971), provided, however, that all questions as to the applicability of Executive Order No. 3 to this Agreement except as provided below shall be judicially determined after

notice and hearing, and provided further that the parties
hereto agree that the applicability of Executive Order No. 3,
if any, to this Agreement is limited to Metro-North's
provision of the Service.

(b)   Executive Order No. 17.   There are incor-
porated in this Agreement by reference, to the extent, if
any, that they are determined to be applicable, the
provisions of Executive Order No. 17 of Governor Thomas J.
Meskill (February 15, 1973), provided, however, that all
questions as to the applicability of Executive Order No. 17
to this Agreement except as provided below shall be judi-
cially determined after notice and hearing, and provided
further that the parties hereto agree that the applicability
of Executive Order No. 17, if any, to this Agreement is
limited to Metro-North's provision of the Service in the
State of Connecticut.

(c)   Non-Discrimination Statute.   The following
provision is set forth in accordance with Conn. Gen. Stat. §
4-114a:

>       "The contractor agrees and warrants that in the
> performance of this contract he will not discriminate or
> permit discrimination against any person or group of
> persons on the grounds of race, color, religious creed,
> age, marital status, national origin, sex, mental retar-
> dation or physical disability, including, but not
> limited to, blindness, unless it is shown by the con-
> tractor that such disability prevents performance of the
> work involved, in any manner prohibited by the laws of
> the United States or the State of Connecticut.  If the
> contract is for a public works project, the contractor

agrees and warrants that he will make good faith efforts to employ minority business enterprises as subcontractors and suppliers of materials on such project. The contractor further agrees to provide the commission on human rights and opportunities with such information requested by the commission concerning the employment practices and procedures of the contractor as relate to the provisions of the this section and section 46a-56."

SECTION 13.10. <u>Interpretation</u>. The Article and Section headings herein and the Table of Contents are for convenience only and shall not affect the construction hereof. Neither this Agreement nor any of the terms hereof may be terminated, amended, supplemented, waived or modified orally, but only by an instrument in writing signed by each of the parties hereto, unless a provision hereof expressly permits fewer than all the parties to effect termination, amendment, supplementation, waiver or modification hereunder, then in accordance with the terms of such provision. This Agreement shall be construed in accordance with and governed by the laws of the State of New York. All Appendices attached hereto are integral parts of this Agreement and the provisions set forth in the Appendices shall bind the parties hereto to the same extent as if such provisions had been set forth in their entirety in the main body of this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed, all as of the day and year first above written.

METROPOLITAN TRANSPORTATION AUTHORITY

By _____
    Robert R. Kiley
    Chairman

Attest:

By _____
    Title: Genl Counsel

[Seal]

METRO-NORTH COMMUTER RAILROAD COMPANY

By _____
    Peter Stangl
    President and General
    Manager

Attest:

By _____
    Title: _____

[Seal]    GENERAL COUNSEL AND SECRETARY

-57-

STATE OF CONNECTICUT, BY THE
CONNECTICUT DEPARTMENT
OF TRANSPORTATION

By _____
      J. William Burns
      Commissioner of Transportation

Attest:

By _____
  Title: Executive Secretary

[Seal]

Approved:                              Approved as to Form:

_____       By _____
Anthony Milano                            Deputy   Attorney General
Secretary, Office of                             June 28, 1985
   Policy and Management

        JUN 27 1985

COUNTY OF NEW YORK )
                   )ss:
STATE OF NEW YORK  )

On the 21st day of June, 1985 before me personally came Robert R. Kiley, to me known, who being by me duly sworn did depose and say that he is the Chairman of Metropolitan Transportation Authority, one of the corporations described in and which executed the foregoing instrument; that he knows the seal of said corporation; that the seal affixed to said instrument is such corporate seal; that it was so affixed by order of a majority of the members of said corporation; and that he signed his name thereto by like order.

_____
Notary Public

HANNAH SUCHALTER
NOTARY PUBLIC, State of New York
No. 41-5303285 Qualified in Queens County
Commission Expires March 30, 19__

[Seal]

STATE OF NEW YORK  )
                   )  ss:
COUNTY OF NEW YORK )

On the 21st day of June, 1985 before me personally came Peter Stangl, to me known, who being by me duly sworn did depose and say that he is the President and General Manager of Metro-North Commuter Railroad Company, one of the corporations described in and which executed the foregoing instrument; that he knows the seal of said corporation; that the seal affixed to said instrument is such corporate seal; that it was so affixed by order of a majority of the members of said corporation; and that he signed his name thereto by like order.

_____
Notary Public

[Seal]

WALTER E. ZULLIG. JR.
Notary Public, State of New York
No. 60-3820426
Qualified in Westchester County
Commission Expires March 30, 1986

STATE OF CONNECTICUT )
                     ) ss:
COUNTY OF HARTFORD   )

Hartford, _____, 1985

On this the ____ day of June, 1985, before me, _____ the undersigned officer, personally appeared J. William Burns, Commissioner of Transportation of the State of Connecticut, known to me (or satisfactorily proven) to be the person described in the foregoing instrument, and acknowledged he executed the same in the capacity therein stated and the purposes therein contained.

IN WITNESS WHEREOF I hereunto set my hand.

_____
Notary Public

MY COMMISSION EXPIRE MARCH 31, 1986
LISA E. STANKEWICZ
NOTARY PUBLIC

[Seal]

-61-

STATE OF CONNECTICUT
DEPARTMENT OF TRANSPORTATION

EXPRESS FINDING
PURSUANT TO SECTION 13b-35
OF THE
GENERAL STATUTES OF CONNECTICUT, AS REVISED

BE IT KNOWN, that I, J. William Burns, Commissioner of Transportation, State of Connecticut, intend to exercise the powers conferred by Subsection (a) of Section 13b-34 of the General Statutes of Connecticut, as revised, and herewith make this Express Finding, pursuant to the provisions of Section 13b-35 of the General Statutes of Connecticut, as revised, that:

1. The transportation facilities on the New Haven Rail Commuter Line with respect to which the powers are to be exercised may be discontinued, disrupted or abandoned in whole or in part.

2. The discontinuance, disruption or abandonment of such facilities will be detrimental to the general welfare of the State.

3. The exercise of such powers is essential to the continuation of such necessary transportation facilities.

4. To insure that specific transportation facilities will be operated in the manner required by the general welfare of the State, State assistance must be provided to the Metro-North Commuter Railroad Company.

Therefore, I intend to execute an Agreement with the Metro-North Commuter Railroad Company and the Metropolitan Transportation Authority whereby the State agrees to reimburse the Metro-North Commuter Railroad Company for rail commuter operating deficits and capital costs for the period from January 1, 1983 through December 31, 1989.

Dated at Wethersfield, Connecticut, this 26th day of June , 1985.

STATE OF CONNECTICUT
DEPARTMENT OF TRANSPORTATION

WITNESSES:

J. William Burns
Commissioner

Name: THERESA E WIRGAIKAS

Name: MARY LEON

## INCUMBENCY CERTIFICATE

I, the undersigned Steven M. Polan, being the duly appointed and incumbent secretary of Metropolitan Transportation Authority ("MTA") do hereby certify that at all times since November 16, 1983, Robert R. Kiley has been the duly appointed and incumbent Chairman of MTA and that a true and correct specimen of his signature is set forth in the space below:

In Witness Whereof, I have hereunto set my hand and the seal of MTA on this 21st day of Jun , 1985.

Steven M. Polan

<u>INCUMBENCY CERTIFICATE</u>

I, the undersigned Walter E. Zullig, Jr., being the duly appointed and incumbent secretary of Metro-North Commuter Railroad Company ("Metro-North") do hereby certify that at all times since September 22, 1982, Peter Stangl has been the duly elected and incumbent President and General Manager of Metro-North and that a true and correct specimen of his signature is set forth in the space below:



In Witness Whereof, I have hereunto set my hand and the seal of Metro-North on this 2nd day of June , 1985.

Walter E. Zullig, Jr.