UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JABARI BUSH,<br>    Plaintiff, | :<br>:<br>: | CIVIL CASE NO.<br>3:19-CV-01621 (JCH) |
| v. | :<br>: | |
| METRO-NORTH COMMUTER<br>RAILROAD CO.,<br>    Defendant. | :<br>:<br>:<br>: | JULY 22, 2021 |

**RULING ON DEFENDANT'S PARTIAL MOTION FOR SUMMARY JUDGMENT (Doc. No. 20)**

I. **INTRODUCTION**

Plaintiff Jabari Bush ("Bush") brought this action on October 15, 2019, raising two claims under the Federal Employers' Liability Act ("FELA") against defendant Metro-North Commuter Railroad Company ("Metro North"). Metro-North has moved for partial summary judgment on the second count in the plaintiff's complaint. Def.'s Mot. for Partial Summ. J. (Doc. No. 20); Def.'s Mem. in Supp. of Mot. for Partial Summ. J. ("Def.'s Mem.") (Doc. No. 22); Def.'s Reply Br. in Further. Supp. of Mot. for Partial Summ. J. ("Def.'s Reply") (Doc. No. 28). Bush opposes that Motion. Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for [Partial] Summ. J. ("Pl.'s Mem.") (Doc. No. 26).

For the reasons stated below, the court grants the defendant's Motion for Partial Summary Judgment.

II.     **FACTS**[1]

Plaintiff Bush was employed as a Machinist by defendant Metro-North on March 18, 2018.  Compl. (Doc. No. 1) ¶ 5; Answer and Affirmative Defenses (Doc. No. 12) ¶ 5.  On that date, at approximately 2:49 PM, Metropolitan Transportation Authority ("MTA") Police Officer John J. Freeman, Jr., was dispatched to Metro-North's Component Change-Out Shop in the New Haven Yard to respond to a report of property damage to a Metro-North company vehicle.[2]  Def.'s Local R. 56(a)1 Statement ("Def.'s R. 56(a)1 Stmt") (Doc. No. 21) ¶ 7; Pl.'s Local R. 56(a)2 Statement ("Pl.'s R. 56(a)2 Stmt") (Doc. No. 25) ¶ 7.  As he was attempting to locate the complainant, Officer Freeman was traveling north on New Haven Yard Road in a patrol car.  Def.'s R. 56(a)1 Stmt ¶ 8; Pl.'s R. 56(a)2 Stmt ¶ 8.  At the same time, Bush's vehicle was exiting the Metro-North employee parking lot, heading west.  Def.'s R. 56(a)1 Stmt ¶ 9; Pl.'s R. 56(a)2 Stmt ¶ 9.  Officer Freeman was "[u]nable to stop" and collided with Bush's vehicle.  Id.  Bush has brought a FELA claim based on this incident, alleging that Metro-North, its agents,

---

[1] The court draws primarily from the parties' Local Rule 56(a) statements and supporting exhibits, while considering only undisputed facts and construing those facts in the light most favorable to Bush.

In its Response to Plaintiff's Local Rule 56(a)2 Statement, Metro-North argues that certain additional facts brought forth by Bush in his Local Rule 56(a)2 Statement should not be considered by the court.  Resp. to Pl.'s Local R. 56(a)2 Statement of Facts in Opp'n to [Partial] Summ. J. (Doc. No. 29); Fed. R. Civ. P. 56(c)(2) ("[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence").  In particular, Metro-North disputes the admissibility of plaintiff's exhibits that purport to establish that Metro-North maintained its own police force prior to 1998, and that the MTA officer who collided with Bush in the accident that gave rise to his second claim admitted it was his fault.  Resp. to Pl.'s Local R. 56(a)2 Statement of Facts in Opp'n to [Partial] Summ. J. at ¶¶ 10, 18-20.  Because the court determines that these facts – even if admitted – are not material for deciding the narrow legal question presented by this Motion, it does not address the admissibility of the exhibits in question for the purpose of establishing the disputed facts.

[2] The court notes an apparent discrepancy in the record pertaining to the date on which the accident occurred.  The parties both stipulate that it happened on March 18, 2018.  See Def.'s R. 56(a)1 Stmt ¶ 6; Pl.'s R. 56(a)2 Stmt ¶ 6.  The narrative from the Incident Report, however, states that the accident occurred on March 13, 2018.  Ex. A (Doc. No. 21-1) at 3.  Relevant here, however, is that the parties agree Bush was employed by Metro-North at the time of the accident.

servants, and employees were negligent in a variety of ways that led to the accident. Compl. ¶¶ 23-24.

The relationship between the MTA and Metro-North is of primary importance for the purposes of the present Motion. The MTA is "a body corporate and politic" and a "public benefit corporation" of the State of New York. N.Y. PUB. AUTH. LAW § 1263(a)(1); Def.'s R. 56(a)1 Stmt ¶ 1; Pl.'s R. 56(a)2 Stmt ¶ 1. Metro-North is also a public benefit corporation and a wholly owned subsidiary of the MTA. N.Y. PUB. AUTH. LAW § 1266(5); CONN. GEN. STAT. § 16-363; Def.'s R. 56(a)1 Stmt ¶ 2; Pl.'s R. 56(a)2 Stmt ¶ 2. The MTA operates its own police force, including for its subsidiary corporations such as Metro-North. N.Y. PUB. AUTH. LAW § 1266-h(1); Def.'s R. 56(a)1 Stmt ¶ 3; Pl.'s R. 56(a)2 Stmt ¶ 3.

Metro-North operates a commuter rail service between New Haven and Grand Central. Def.'s R. 56(a)1 Stmt ¶ 4; Pl.'s R. 56(a)2 Stmt ¶ 4. It does so in partnership with the MTA and the State of Connecticut Department of Transportation ("CDOT") under a service contract and pursuant to the interstate compact between New York and Connecticut. Id. CDOT owns all of the rail properties Metro-North operates on in Connecticut, including those on the "New Haven Line" from the New York border to New Haven. Def.'s R. 56(a)1 Stmt ¶ 5; Pl.'s R. 56(a)2 Stmt ¶ 5.

### III. STANDARD

A motion for summary judgment will be granted if the record shows "no genuine dispute as to any material fact and the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. Celotex Corp. v. Cartrett, 477 U.S. 317, 323 (1986). The non-moving party may defeat the motion by producing sufficient

specific facts to establish that there is a genuine issue of material fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). A genuine issue exists where the evidence is such that a reasonable jury could decide in the non-moving party's favor. See, e.g., Biondo v. Kaledia Health, 935 F.3d 68, 73 (2d Cir. 2019) (citing Anderson, 477 U.S. at 248)).

IV. DISCUSSION

This case presents a seemingly straightforward question: is an MTA police officer on CDOT property responding to a report of property damage to a Metro-North company vehicle an agent of Metro-North for the purposes of FELA? The path to the answer, of course, is somewhat complex.

A. Statutory Backdrop

FELA provides, in relevant part, that "[e]very common carrier by railroad . . . shall be liable in damages to any person suffering injury while he is employed by such carrier . . . [for injury] resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier." FELA, 42 U.S.C. § 51 (emphasis added).

Congress enacted FELA in "response to the special needs of railroad workers who are daily exposed to the risks inherent in railroad work and are helpless to provide adequately for their own safety." Sinkler v. Missouri Pac. R. Co., 356 U.S. 326, 329 (1958). As such, FELA has a "broad purpose," and aims to "adjust . . . [the] inescapable expense of railroading . . . equitably between the worker and the carrier." Id. at 329-30. To accomplish this, "it was the conception of [FELA] that the railroad was a unitary enterprise, its economic resources obligated to bear the burden of all injuries befalling those engaged in the enterprise arising out of the fault of any other member engaged in the common endeavor. Id. at 330.

In assessing claims under FELA, courts "need not depend upon common-law principles of liability," because the statue is "an avowed departure from the rules of common law." Id. at 329.  In particular, "an accommodating scope [is] given to the word 'agents' to give vitality to the standard governing the liability of carriers to their workers injured on the job." Id. at 330-31.  When assessing whether an agent relationship exists between a principal and an independent contractor under FELA, the degree of "control" or "detailed supervision" by the principal is "irrelevant," provided the contractor is "furthering the operational activities" of the railroad. Id. at 328, 331.

B.     The Sinkler Test

In Sinkler, the Supreme Court applied these principles to hold that "when a railroad employee's injury is caused in whole or in part by the fault of others performing, under contract, operational activities of his employer, such others are 'agents' of the employer within the meaning of [45 U.S.C. § 51]." Id. at 331-32 (emphasis added).

Sinkler and its progeny have established that, at least in circumstances where: (1) a contract exists between the principal and the third party, and; (2) the third party is performing operational activities of the principal, the principal is liable for the third party's negligence under FELA, provided the other conditions of the statute are met. See, e.g., Hopson v. Texaco, Inc., 383 U.S. 262 (1966) (per curium) (directly applying Sinkler to hold company liable for the negligence of a taxi driver it had hired to transport ill seamen when the transport was "a vital part of the ship's total operations");[3]

---

[3] Hopson was an action brought under the Jones Act.  "The Jones Act incorporates the standards of the Federal Employers' Liability Act, as amended, which renders an employer liable for the injuries negligently inflicted on its employees by its officers, agents, or employees." Hopson, 383 U.S. at 263. Because the standard relevant to the present case is the same for FELA and the Jones Act, the court looks to precedent from cases brought under both statutes here, as have the parties in their memoranda.

Fitzgerald v. A.L. Burbank & Co., 451 F.2d 670, 680 (2d Cir. 1971) (holding that a physician providing "medical services . . . under contract, for the shipowner as part of its operational activities" was an agent of the shipowner for the purposes of the Jones Act).

The first prong of this test is straightforward: it is met if there is a contractual relationship between the principal and the third party. Id.  The second is less clear-cut, although the scope of what constitutes an "operational activity" has "been given a generous interpretation by the courts." Thomas v. Grigorescu, 582 F.Supp. 514, 517 (S.D.N.Y. 1984); see also Mele v. Metropolitan Transp. Authority, No. 04-CIV-3661, 2006 WL 2255080, *4 (D.Conn. Aug. 4, 2006).  For example, a Y.M.C.A. providing room and board to a railroad employee staying out of town for work pursuant to an arrangement with his employer was found to be an "operational activity," making the Y.M.C.A. an agent of the railroad for the purposes of FELA.  Carney v. Pittsburgh & L.E.R. Co., 316 F.2d 277, 279 (3d Cir. 1963).  See generally Thomas, 582 F. Supp. at 517 (citing further cases where courts have found the "operational activity" prong of the Sinkler test is met).

Regardless of the breadth of the "operational activity" prong, it is settled that – at least in circumstances where the two prongs of the Sinkler test are met – a principal will be liable for the negligence of the third party it contracts with under FELA.  What is less clear are the circumstances in which liability can still exist in situations where the Sinkler test is not met.  It is to these cases the court now turns.

    C.    Beyond Sinkler

The Sinkler test establishes conditions sufficient to hold a principal liable for the negligence of a third party under FELA, but courts have split over whether the Sinkler conditions are necessary for such liability to exist.

Some courts have suggested that the absence of a contract precludes a claim under FELA for the negligence of a third party.  See, e.g., Epling v. M.T. Epling Co., 435 F.2d 732, 736 (6th Cir. 1970) ("even the sweeping non-delegable duty imposed by the Jones Act upon the employer to provide his employees with a safe place to work will permit the imputation of a third party's negligence to the employer only where there has been a breach of some contractual duty owed by the third party to the employer"); Pyzynski v. Pennsylvania Cent. Transp. Co., 438 F.Supp. 1044, 1049 (W.D.N.Y. 1977) ("the 'bottom line' herein is that, unless the performance of an operational activity of the railroad is contractually left to another, there is no room for imputation of the other's negligence to the railroad"); Thomas, 582 F.Supp. at 517-18 (citing Epling and noting that the existence of a contract "is a critical feature of liability, for it is the contract which permits a finding that the negligent party was the 'agent' of the employer.  In the absence of such a contract, there is no basis for liability under [ ] FELA."); Hamilton v. Marine Carriers Corp., 332 F.Supp. 223, 227 (E.D. Pa. 1971) ("it should be understood that a contractual relationship must exist between the owner or his agent and the negligent party to establish liability under the Jones Act").

Other courts have emphasized that it is not the existence of a contract per se that is determinative, but also the degree of choice the principal had in choosing the third party.  For instance, in Randle v. Crosby Tugs, L.L.C., 911 F.3d 280 (5th Cir. 2018), the Fifth Circuit held that a medical provider was not the agent of a shipowner when the plaintiff had a stroke, the captain immediately called 911, and the physicians at the nearby hospital incorrectly diagnosed the plaintiff's condition.  In arriving at this conclusion, the court emphasized that, without a contractual relationship, "the basic

7

principles of agency law require[ ] that an agency relationship arise from the principal's act in selecting the agent." Randle, 911 F.3d at 286.  Because the shipowner "did not select [the hospital] as its agent or otherwise express its assent that [the hospital] would act on its behalf," no agency relationship was formed.  Id.

Similarly, the court in Broussard v. Marine Transport Lines, Inc., 369 F.Supp. 103 (E.D. Tex. 1974), held that a shipowner was not liable for the negligence of a truck driver, in part, because, unlike in Hopson where the shipowner had "chose[n] the cab driver," it was "the employee who chose his mode of transportation" to return to the ship. Broussard, 369 F.Supp. at 105.  To be sure, Hopson would have been equally distinguishable on the grounds that the shipowner had contracted directly with the cab driver in that case, while in Broussard the shipowner had no contractual relationship with the truck driver.  But instead, the court focused primarily on whether or not the principal had a role in selecting the driver.  See also Thomas, 528 F.Supp. at 518 (since plaintiffs chose their driver and "the railroad played no role in that selection, fairness does not favor imposing liability on the railroad").

This same logic is evident in two cases involving railroad employees traveling for work and staying at hotels that negligently caused them to be injured.  In Carney, the Third Circuit held that the negligence of the Y.M.C.A. where the employee was staying could be imputed to the railroad in part because "the Y.M.C.A. [was] supplying [its] services to [the] plaintiff" pursuant to an "arrangement with the railroad." Carney, 316 F.2d at 279.  Yet in factually similar circumstances, other courts have declined to extend Carney where it was the employee, rather than the railroad, that chose the hotel.  See, e.g., Vann v. Long Island R. Co., 502 N.Y.S.2d 596, 599 (N.Y. Sup. Ct. 1986), aff'd, 519

N.Y.S.2d 732 (N.Y. App. Div. 1987) (holding the hotel is not an agent of the railroad because the railroad "never chose this independent contractor to perform services on behalf of its employee. In all other cases, where the courts have found that an independent contractor was an agent of the railroad for the purposes of [FELA], the railroad chose the entity for its employee to use.").

Taken together, these cases suggest that the existence of a contract is not the sole relevant factor for determining whether an agency relationship exists. The amount of autonomy the principal has in selecting the third party matters as well.

In contrast, other courts have taken a third route and returned to the "traditional [common law] notions of agency" to assess liability in circumstances where the Sinkler test is not met. Beno v. Murray American River Towing, Inc., No. 16-1128, 2017 WL 3301445, *14 (W.D. Pa. Aug. 3, 2017). In Beno, the court canvassed case law and observed that "[a]n agency relationship for purpose of [ ] FELA . . . does not appear to be limited to the situation described by the Court in Sinkler and Hopson, i.e., a situation in which the third party is under contract with the employer to perform the operational activities of the employer; rather, an agency relationship under FELA also includes situations in which the employer had the ability to control or actually controlled the acts of the third party." Id. at *8. Thus, according to the Beno court, simply determining that the Sinkler test is not met does not end the court's inquiry: it must also determine "whether the employer had the ability to control or actually controlled the acts of the third party." Id.

Indeed, this approach finds some support in the cases cited by the Beno court. In Craig v. Atlantic Richfield Co., 19 F.3d 472, 478 (9th Cir. 1994), the Ninth Circuit

9

affirmed the district court's approach in holding that a charter aircraft operator was not an agent of an oil barge operator. After concluding there was no contractual relationship between the two companies, "[t]he district court considered one additional factor – whether [the oil barge operator] had 'actual control' over the [charter airline]. It properly concluded that [it did not]." Craig, 19 F.3d at 478; see also id. (citing Tim v. American President Lines, Ltd., 409 F.2d 385 (9th Cir. 1969), and describing how in that case there was no contract, the defendant employer had not selected the third party, and, because the "defendant employer . . . had no ownership or other financial interest in [the third party]," there was no agency relationship).

The ramifications of this approach are most apparent in Kenny v. BNSF Ry. Co., No. 2-11-cv-624, 2012 WL 2390004 (W.D. Wash. June 25, 2012). There, the court found that the defendant had not contracted directly with the negligent third party and that there was no agency relationship "under the Hopson/Sickler doctrine." Kenny, 2012 WL 2390004 at *4. Still, because "[g]enuine issues of material fact exist[ed] as to the level of control [the principal] exerted over [the third party]," and those "unresolved factual questions preclude[d] the Court from holding" whether not an agency relationship had been established for the purposes of FELA, the court denied the defendant's Motion for Summary Judgment.

The Beno retreat to traditional common law notions of agency diverges from the first two approaches discussed above. But what is clear is that courts have not yet arrived at a uniform standard to apply in circumstances where the Sickler test is not met. Some have suggested that the absence of a contract categorically precludes an agency relationship for the purposes of FELA; others have emphasized the importance

10

of the principal affirmatively choosing the third party; and still others have looked to the degree of control the principal exercised over the third party in the absence of a contract or selection.  With this in mind, the court turns to the facts of this particular case and the arguments from the parties.

    D.    <u>Analysis</u>

In the present case, Bush has brought a FELA claim against Metro-North for an incident involving an MTA police officer who, while responding to a report of property damage to a Metro-North car, collided with Bush's vehicle.  At issue is whether the MTA police officer, in responding to the report and colliding with Bush, was acting as an agent of Metro-North.[4]

First, the court analyzes whether the MTA officer would be an agent of Metro-North for the purposes of FELA under the <u>Sinkler</u> test.  It concludes he would not. There are no facts in the record demonstrating that Officer Freeman was acting pursuant to a contract between Metro-North and the MTA Police Department.[5]  That alone is fatal to plaintiff's ability to satisfy the <u>Sinkler</u> test.

---

[4] The court notes that, in his Complaint, Bush appears to allege that Metro-North itself – not just MTA police officer Freeman – was negligent in a variety of ways that led to the accident.  <u>See</u> Compl. ¶ 24 (alleging that "defendant, its agents, servants and employees" were negligent in seven different ways but declining to specify which parties, exactly, were negligent in which ways).  In his Local Rule 56(a)2 Statement, however, plaintiff has not attempted to bring forth any facts related to Metro-North's alleged negligence, and instead only focuses on facts regarding the relationship between Metro-North and the MTA Police Department and Officer Freeman's alleged negligence.  Pl.'s R. 56(a)2 Stmt.  Similarly, plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment focuses entirely on the relationship between Metro-North and the MTA.  Pl.'s Memo at 7-8.  Accordingly, plaintiff has not established that there is a genuine issue of material fact for trial as to any negligence by Metro-North itself that he may have alleged in its Complaint.

[5] There is a contract between Metro-North, CDOT, and the MTA in the record.  <u>See</u> Ex. C (Doc. No. 21-3).  This contract, however, was signed in 1985, long before the MTA police force was created. <u>Id.</u>; N.Y. PUB. AUTH. LAW § 1266-h(1)-(2); Pl.'s R. 56(a)2 Stmt ¶ 11; Resp. to Pl.'s Local R. 56(a)2 Statement of Facts in Opp'n to [Partial] Summ. J. ¶ 11.  The parties agree that the contract pertains to Metro-North's "operat[ion of] the commuter rail service between New Haven and Grand Central terminal,"

However, it is worth noting that Officer Freeman's actions were within the scope of Metro-North's operational activities.  In Greene v. Long Island R. Co., 280 F.3d 224 (2d Cir. 2002), the Second Circuit held that "with respect to the police officers whom MTA employs to provide security for [Long Island Railroad] parking lots, [the] MTA 'operates' an 'interstate common carrier by railroad' within the meaning of FELA," thus making the MTA itself subject to claims under FELA with respect to its own negligent actions that cause injury to those officers.  Greene, 280 F.3d at 240.  In reaching that conclusion, the court reasoned that the police services the MTA provided were "directly in furtherance [of Long Island Railroad's] business as a railroad . . . [since] [c]ommuters who drive to [their] stations require safe places in which to leave their cars."  Id. at 239.  Given the "generous interpretation" courts have afforded plaintiffs in defining an operational activity, and the fact that MTA's policing activities directly advance Metro-North's interstate railroad business, Officer Freeman's actions would satisfy the second prong of the Sinkler test.  Thomas, 582 F. Supp. at 517.

Still, the absence of a contract means the first prong of the test – and the Sinkler test overall – is not met.  In his Memorandum opposing the Motion for Partial Summary Judgment, Bush argues that Sinkler should still apply even absent a contract.  Pl.'s Mem. at 7-8.  In support of his position, however, Bush cites six cases, none of which involve fact patterns where the court held that an agency relationship existed for the purposes of FELA in the absence of a contract.  Id. at 7.  Instead, Bush focuses on the MTA's corporate relationship with Metro-North and the fact that Metro-North itself requested that Officer Freeman come to the location where the accident occurred.  Id.

---

and do not contend that it governs the relationship between Metro-North and the MTA police force.  Def.'s R. 56(a)1 Stmt ¶ 4; Pl.'s R. 56(a)2 Stmt ¶ 4.

at 8.  In reality, Bush is not asking the court to <u>apply</u> <u>Sinkler</u>: rather, he is asking the court to <u>extend</u> <u>Sinkler</u> to situations, as is the case here, where no contract exists, but the principal has requested that the third party come to its place of business for the purpose of furthering its operational activities.

In response, Metro-North correctly points out that plaintiff has cited no precedent where a court has found that a third party was an agent of a railroad under FELA in the absence of a contract. Def.'s Reply at 2-6.  But it is equally true that Metro-North cannot cite a binding authority that precludes this court from finding that an agency relationship exists simply because there is no contract.  And while, as Metro-North argues, other courts have indicated that "a prerequisite to FELA agency is a contract," it cites no Supreme Court or Second Circuit cases to that effect, nor is the court aware of any that draw such a bright-line conclusion.  <u>Id.</u> at 4.  Instead, the court is persuaded by the case law discussed above, which still allows <u>Sinkler</u> to be extended, absent a contract, in circumstances when the principal affirmatively chooses the third party or controls (or has the ability to control) its actions.

However, neither of these conditions are met here.  First, there are no facts in the record establishing that Metro-North exercises – or has the ability to exercise – control over MTA police officers.  Metro-North is a wholly owned subsidiary of the MTA.  If anything, the corporate relationship between the two parties indicates that it is the MTA, as Metro-North's parent company, that can exercise control over Metro-North.

Second, Metro-North did not affirmatively choose the MTA police force, at least not in the same manner as principals did in the case law cited above.  In <u>Hopson</u> and <u>Carney</u>, the shipowner and railroad were free to choose any driver or hotel for their

employees. They selected the third party and expressed their assent that it would act on their behalf. As such, the Supreme Court and the Third Circuit found that an agency relationship had been created.

In circumstances where the ability to choose the third party was highly constrained or nonexistent, however, courts have reached the opposite conclusion. For instance, in <u>Randle</u> a seaman had a stroke and, reacting to the emergency, the captain of the ship immediately called 911. The seaman was eventually transported a medical center, where his condition was misdiagnosed. The Fifth Circuit held that there was no evidence the captain knew the seaman would be transported to the particular medical center in question, and that he had not affirmatively selected the medical center as his agent. <u>Randle</u>, 911 F.3d at 286.

Plaintiff argues that Metro-North, in requesting that the MTA Police Department respond to a report of property damage to a Metro-North vehicle, affirmatively chose Officer Freeman as its agent. Pl.'s Memo at 8. But this ignores the fact that it was the New York Legislature – not Metro-North – that authorized the MTA to create a police force to serve its subsidiaries. To be sure, Metro-North does not appear to rely on the MTA Police Department to the exclusion of local authorities, and therefore did have the option of calling the local police instead. Resp. to Pl.'s Local R. 56(a)2 Statement of Facts in Opp'n to [Partial] Summ. J. ¶ 15. But its ability to choose a third party to address the property damage here was highly constrained and dictated more by statute than Metro-North itself. In all other cases cited here where a court found the negligent third party to be an agent of the principal, the principal had been free to identify and choose between different third parties to provide the delegated service. That is not the

case here.  As the Thomas court found, when "the railroad played no role in [the selection of the third party], fairness does not favor imposing liability on the railroad." Thomas, 582 F.Supp. at 518.  That is equally true here, where Metro-North had little discretion in determining whom to call to respond to a report of property damage, and its choices were circumscribed by statute.

For the above reasons, the court finds that, for the purposes of the Second Count of plaintiff's Complaint, no reasonable jury could conclude that MTA police officer Freeman was an agent of Metro-North.  As such, Metro-North cannot be held liable for any negligent action by Officer Freeman alleged by plaintiff.  The Partial Motion for Summary Judgment is therefore granted as to count two of the plaintiff's complaint.

## V. CONCLUSION

For the reasons discussed above, the court grants the defendant's Motion for Partial Summary Judgment.

**SO ORDERED.**

Dated at New Haven, Connecticut this 22nd day of July 2021.

/s/ Janet C. Hall
Janet C. Hall
United States District Judge